Good morning everyone. We are very happy to have all of you here today and we are particularly happy to have Judge Shaw of the Northern District of Illinois sitting with us. So, we will start. Our first case for the day is Appeal 15-1545 and it's the State of Harold Stuller v. United States. And it's Mr. Reed. Good morning, Mr. Reed. Good morning, Judge Rovner, Judge Shaw, and Judge Williams, court staff, and Mr. Calderon. Good morning. My name is David Reed and I represent the plaintiff's appellants, Wilma Stuller and LSA, Inc. We assert that there are four primary issues before the court today. It's set forth in the briefs and we believe that after careful review, the court will reverse the judgment below. The first issue, we think, had a minimum. In other words, even if this court were to affirm the judgment below, we believe that the plaintiff's appellants are entitled to refunds for their reported rental income on their individual tax returns for the years 2003, 2004, and 2005. We would make this argument. Let me, forgive me for interrupting you, but if I could just start you out. In light of the evidence that the horse farm was unprofitable in all years but one, but one, and yet there was no apparent effort to adopt a new business plan or otherwise take corrective actions to turn it around, how would we hold that the court below committed clear error in determining that it was not undertaken for profit? Because that's what we, I think that's what we have to zero in on here. Thank you, Judge. Well, we disagree with the court's opinion. We think that the plaintiff's appellants took several actions over the years changing their operations and procedures to improve profit. One such action is they relocated their farm horse breeding operation from Springfield, Illinois to Tennessee. They also purchased a larger farm and additional property in Tennessee for pasture land. They dug ponds for horses, which reduced water costs and water transportation costs on the farm. Are any of those things any different than what they would have done if they were enjoying the horses for pleasure? Absolutely. How so? Well, they had 35 to 40 horses, and the horses would consume a lot of water. If they had three or four horses, they could have just put a bin or a tub out and filled it with water, and they wouldn't have had to refill it every day because they would have had fewer horses. It would have just been for personal. Also, they had a barn at their house where they kept their personal horses, and that would have been easier to refill or to fill it with water as opposed to driving out on the farm. It's a large farm, driving out on the farm and refilling water on the farm property. One of the things I don't get is if this was a for-profit business, how horses were given away free, or they were sold for prices so low that expenses could not be covered. Expensive horses were brought from moats, and they couldn't even be used for breeding. Well, that's a good question, Judge. I think during this time period, 2003 to 2005, the economy was tanking. Horse sales weren't good. If it was a seller's market, you could get the price you wanted, but since it was a buyer's market, you had to sell a horse for what it was worth or what someone would pay. Also, the fact that they did give away some horses, that was done partially for marketing, partially for promotion. But other than horse shows and trail rides, the most important industry show was Skip. Show horses that did participate in any kind of marketing were not used for breeding. And then getting back to the price of the horses sold, Moats certainly got a lot of money for the horses he sold. And then he had a big salary. He got half of the sales proceeds, all the prize money, the right to breed his own horses for free, and the right to trade horses with LSA without documenting the value of the horses. Well, Mack Moats was a long time. They had worked together for probably 40 years. They had a handshake agreement. Mack Moats did a lot of work on the farm in addition to his agreement to train the horses. He also cared for them when they stayed at his barn. He charged the stellars less than what he charged other business customers to be on the farm. He also was responsible for all the care on the farm and mucking stalls and repairing fences. And there was an awful lot of work that Mr. Moats did, Mr. Moats and his employees did on the farm. And I think the court below, frankly, just didn't recognize that. Did he testify at trial as to the practices at the horse farm, including the time and effort expended, the expertise of the plaintiffs and their advisors, and the manner in which the activities were carried out, all of which would be relevant to those nine factors? Yes, Judge Rogner, he did testify at trial. However... Because what I'm wondering, forgive me, but what I'm wondering is what additional impact do you think it would have had on your case if he'd been allowed to also testify as an expert witness, which of course didn't occur. Yes. I think it would have been a huge difference, frankly. And Mr. Moats is a simple man. I think he graduated from eighth grade, but he's been in this business for 50-plus years. Well, he's a very talented man, so... He's not formally educated, and I think that bothers him. I think he's nervous in courtrooms and testifying. Nonetheless, he did testify. So are all of us. Right? Right, everyone? We're all nervous. That's right. But nonetheless, he did testify at length with his procedures and things he did, his methods. And frankly, he just stated that he did things, whatever he did, he did it at the least possible cost, to do it yourself, not to hire someone to do it, and that way you could stay in business. So what was his methodology to arrive at a conclusion that this was a for-profit business? His methodology was based on his personal observations, which is legitimate for an expert to base opinions on personal observation. It was based on his experience, and quite frankly, his methodology was quite simple. He didn't go into great length or detail in his testimony to the court, but his testimony was that he spent the least possible money on everything that had to be done. For instance, the taxpayers, plaintiffs' appellants, bought some medical instruments and did some of their medical tests for the courts. They did away with insurance on the horses because they were spending too much insurance. They dug the ponds. They bought additional land. They planted grass so that the horses could feed on the grass in the fields and lower the grain cost. But those observations were admitted, and the judge considered those observations when going through the factors? I think the judge below said that he didn't give any methodology or data, and I think it's regrettable for all involved, but the government had filed a motion in limine to keep him out as an expert, and we disagreed and filed a motion in opposition, but the thing that never occurred was there was never a Rule 104A ruling or hearing on the reasonableness of any of Mack Motz's observations. And as a result, that issue wasn't addressed and really, in my view, didn't come to the surface until six months later when the judge ruled he couldn't testify as an expert. But see, the methodology is different than the steps he took to try to save money or to try to save the business. For example, he didn't do any review of the finances. He didn't look at the finances in light of the nine-factor tests that the regulations say are important. He has no experience in financing or the business side of breeding and selling horses. I understand that he knows about trying to save costs and that kind of thing, but that's different than being on the financial side or the business side of breeding and selling. I understand, Judge Williams, but he ran his own business for 40-plus years. He testified that he has stayed in business while many other barns went out of business during this same period. So, yes, you're correct, he didn't go into any detail on... Right, and he didn't do any analysis of all those that had gone out of business versus his, and he didn't use these factors. Well, he didn't do an analysis, but I think his message was that if you do things as cheaply as possible or be as frugal as possible, don't buy a new truck, don't hire anyone to do work that you can do yourself. If you follow that methodology, you're going to put yourself in the best position to survive. Isn't keeping costs down just as consistent with running it as a personal hobby as running it for profit, and how would that make it clearly erroneous for the district judge to have come out the way he did? Well, respectfully, I think that if the court finds that there was no Rule 104.8 determination of reasonableness at the start of this trial, I don't think the standard is an abuse of discretion. I think it's a lesser standard. You're in your rebuttal if you want to save some time. Yeah, I'll save some time for my rebuttal. Sure. And thank you all. Thank you. Good morning, Mr. Calderon. Good morning, Your Honors. I'm Richard Calderoni on behalf of the United States. May it please the court. It was not clear error for the district court to find that LSA is an activity not engaged in for profit during the years 2003 to 2005. Why wouldn't the number of horses on a farm be indicative of whether the farm is operated for business or pleasure? I mean, could we really hold that whether a farm has two horses or 40 horses or 100 horses, you know, provides no indication whatsoever as to whether the horses are owned and maintained merely for pleasure or for profit? Well, Your Honor, it was not clearly erroneous for the district court to reach that finding on this record. There was testimony from Wayne Hipsley, the government's expert, that based on his years of traveling around the entire continent consulting with people on horse farms, he believed that there would be pleasure farms with 20 or 30 horses on them. In fact, he testified that his own father's farm, which was never run as a business, had about 20 horses on it. And therefore, there was support for that particular finding in the record. There are a host of other facts discussed in the government's brief that further support the district court's finding that LSA was not a for profit activity. I want to briefly just touch on three aspects of that evidence this morning. First, as Judge Rovner noted, the losses in this case are large and consistent across a number of years. In fact, every year from 1999 to 2009, LSA lost in excess of $100,000. Its only profit was in 1997, and that profit was only $1,500. And its history of profits and losses is thus commensurate with any number of other activities, including the dog breeding operation that this court considered in Berger, that have been found not to be for profit activities. Of course, the record keeping here was at least sufficient to handle tax matters and to obtain a general idea of income and expenses. Your Honor, it was certainly sufficient to handle tax matters. It was not sufficient to give the taxpayers an idea of revenue and expenses on an ongoing basis. Mr. Hipsley testified that LSA had no budget, which in his view would be very helpful in assessing the ongoing financial health of the enterprise. That it did not have the documents necessary to show costs by category on an ongoing basis, which he testified were necessary to get an accurate view of those costs and to address cost centers. And he testified that LSA did not have the sale records that would be necessary to track its revenue over time. Moreover, the records in this case are similar both to the records in Berger, which this court found were not sufficient to allow the taxpayers to make informed business decisions, and to the records in Filios, which the First Circuit found had all three of the insufficiencies that Mr. Hipsley discussed. An inability to address costs, an inability to track profits, and an inability to look at the overall financial health of the enterprise. And then in terms of the timing for the business plan, am I right that that was created after the lawyer's advice, after the audit began? Yes, Your Honor, that's exactly correct. In fact, after the audit began, LSA also created a website for the first time. And within about a year after the notices of deficiency were issued, Wilma Stolermotz determined that she would no longer carry on LSA at all. She terminated the corporation at that point, after it became clear that the tax benefits would no longer be forthcoming. Does it matter to your view the case that the burden was on the defense here? No, Your Honor, it does not. As the tax court, I believe, found in its opinion, the burden-shifting procedure only comes into play when there's an evidentiary tie. There is not an evidentiary tie in the district courts. And here, of course, the standard of review is only for clear-error appeal. It's also highly relevant that the Stollers had a significant amount of outside income throughout the years in which LSA was operating. That income during the years at issue ranged between about $570,000 and $1.7 million per year, which means that between 2003 and 2005, the Stollers' attempt to deduct LSA's losses would have generated about $50,000 in annual tax savings. It's therefore unsurprising that in their reply brief, taxpayers actually concede that this factor favors the government. Moreover... Why? They're being honest. Well, yes, Your Honor, but in this context, if taxpayers have substantial outside income and are attempting to use deductions from an activity to generate tax savings, the eighth factor in the regulations weighs in favor of the government. In fact, Congress passed Section 183... No, I mean the fact that they concede that. Oh, yes. Certainly, Your Honor. Nice to see a concession once in a while. Yes, Your Honor. In fact, the Stollers are... Want to concede anything? No, Your Honor, I'm not prepared to concede anything at this particular moment. Finally, just on the unbusiness-like records aspect of this issue, Judge Williams, I think, articulated very many of the reasons why LSA was not run in a business-like manner. I would simply add that there was no attempt to find new revenue sources or to increase revenue at all during this period. As Judge Shah mentioned, the First Circuit found in a state of power that simply cutting costs is fully consistent with the taxpayer wanting to make a hobby sustainable over the long term. You know, delivery and steak and shake were both restaurant businesses, yet the District Court considered delivery, but not the steak and shake, as analogous to the horse farm in considering that fifth factor. Shouldn't the Court have either considered both of them or determined that neither of them was similar enough to be relevant under Factor V? It seems to me that at best, this factor should have been considered a neutral one rather than one that weighed in favor of the defendants. Your Honor, the District Court, in our review, found that steak and shake was simply less relevant than the independent restaurant because the Stollers had full control over both LSA and the independent restaurant, but not the steak and shake businesses. In any event, the District Court was justified in finding that the Stollers did not apply any business knowledge they gained from the steak and shake in the context of LSA, and even if this fifth factor were to be neutral, it would not change the overall analysis that LSA was not, on the whole, run for profit. Taxpayers' fallback position here is that even if LSA is not a for-profit enterprise, the Stollers should be entitled to remove from their individual tax returns the rental income that they reported receiving from LSA. That argument conflates two separate and independent relationships that the Stollers had with LSA. On one hand, the Stollers were LSA's shareholders, its owners, and in that capacity, they attempted to deduct the corporation's losses between 2003 and 2005. In that capacity, they would also have had to report as pass-through income any net income that the corporation generated. But because an S-corporation is an independent entity that files its own tax returns and calculates its own income, the shareholders of such a corporation are entitled to enter into contracts and other relationships with the corporation as if they were unrelated parties. Would the government face any conflicting claims if we adopted the appellant's view of these rental payments? Your Honor, the government has already faced conflicting claims. Initially, both the Stollers and LSA reported a situation in which a transaction in which the Stollers had purchased land in their individual names and then rented that land to LSA for its use in return for annual rental payments. The tax benefit to the Stollers in that case was they were able to either lessen LSA's income or increase the deductions they were claiming for its losses. Now that it's clear that they're not entitled to those deductions, they are seeking to undo that transaction by saying there is no rent at all and by removing that individual rental income from their tax returns. But they're not entitled to do so, as the Ninth Circuit held in the Catalano case, because this is income they received in their individual capacity. It's not pass-through income from the corporation. In fact, it couldn't possibly be pass-through income from the corporation because the rental payments were an expense to LSA, even though they were income to the Stollers. Finally, Your Honor, very briefly about the District Court's holding that Mack Motz is not qualified to testify as an expert. Even if the District Court had considered his testimony, it would have made no difference. The District Court issued a lengthy and thorough opinion that considered the trial testimony in detail, including much of the factual testimony presented by Mack Motz, specifically discussed much of that testimony, and therefore the admission of Mack Motz's conclusion that LSA was a for-profit enterprise would not have made any difference. Moreover, as both Judge Williams and Judge Shah suggested earlier, Mack Motz had no reliable methodology here. His methods for how to control costs on the farms, such as they were, are not relevant to the question of whether he had a reliable methodology underpinning his conclusion that LSA was a for-profit enterprise. And as Judge Williams suggested, Mack Motz had no knowledge of the underlying facts here because he conceded freely that he had no knowledge of LSA's finances, even though he married Wilma Stoller Motz in 2012. And he also had no knowledge of the governing law. Wait a minute. I'm sorry. There's a disconnect there. What do you mean, even though you married her? Only, Your Honor, that he was obviously... She had to tell him everything? No, Your Honor, simply that they had a very close relationship and, you know, it's also in the record, I could put it this way, they discussed the running of LSA every day, even while Ms. Stoller Motz was recuperating from the 2003 fire. So they simply, all I'm saying is they were communicating all the time, and yet he knew nothing about LSA's finances, and therefore he was not qualified to testify as an expert on that point, and he did not have a reliable methodology. Does an expert have to know the nine factors in the law in order to testify under what an expert could testify to about whether or not a business is run for profit or not? Why do the nine factors, which are a legal test, require a witness to know those nine factors? Your Honor, our position is at a minimum the expert must know either the underlying facts or the legal standards, certainly some knowledge of the underlying facts, which Mr. Motz did not have here. I'm happy to answer any further questions, otherwise I will finish there. Thank you very much for your time. Thank you. Thank you, judges. Very briefly, we would just like to comment that the government's expert, Mr. Hipsley, recommended that the Stullers and LSA take all these additional actions, computerization, additional records, additional cost accounting, et cetera, but everything that Mr. Hipsley recommended, there was a cost to it. And the plaintiff's appellants in this case tried to balance paying additional cost versus conserving cost and trying to earn a profit. We think the fact that some of these additional activities were not commenced just reflects their intent to earn a profit rather than spend money for additional administrative items that may or may not help. Further, we think that Mr. Hipsley himself, in his expert report, conceded that the plaintiffs and Mr. Motz had sufficient expertise to advise the Stullers in this case. Mr. Motz had been friends of Hal Stuller, now deceased, and Wilma Stuller for 40 years, so they had a good business relationship and were friends. We don't think that that should cloud Mr. Motz's professional judgment or his ability to advise Mrs. Stuller. Finally, counsel talks about the Berger case. We think that needs to be revisited, frankly, or expounded upon. The Filios case, which counsel mentioned, that farm didn't have a profit for 37 years, so that's considerably different than the case at hand. Wayne Hipsley said that the business plan need not be in writing as long as you have a business plan. Upon my recommendation, I thought it was a better practice to put the business plan in writing, even though they had a business plan and the courts have held that it doesn't have to be in writing. Further, we think the fact that at the conclusion of our evidence that the court ruled that the burden of proof had shifted to the defendant, we think that is important, and I think it's more than just a neutral position. I also conceded that the financial status, one of the nine factors, the financial status of the taxpayers favor the government, and I think that's correct. I argue the other eight factors and also the number of horses. I think the number of horses on a farm is a tenth factor. Finally, with no Rule 104A hearing, the methodology and knowledge of the underlying facts, unfortunately, did not come out. Thank you for your time. Thank you very much. Thank you, and thank you as well, Mr. Reed. The case will be taken under advisement. Thank you very much.